**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **Criminal No.  21-117** |
| | ) | |
| DEAGO LEE EDDINGS | ) | |

**<u>Opinion and Order on Motion to Suppress Evidence and Statements</u>**

Defendant Deago Lee Eddings is charged in a one-count indictment with unlawful possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  ECF No. 1.  On September 16, 2020, Mr. Eddings was a backseat passenger in a vehicle traveling north on State Route 51.  At approximately 2:28 a.m. the vehicle was stopped by Brentwood Borough Police Officer Farrell Wagner.  During the course of the traffic stop, law enforcement found a firearm in the backseat, which led to the present charge against Mr. Eddings.

Mr. Eddings has filed a Motion to Suppress Evidence and Statements, in which he seeks to suppress statements he made, and he seeks to suppress a cell phone, a scale, and the firearm found in the backseat of the vehicle.  ECF No. 43.  The government has filed a Response to the Motion, to which Mr. Eddings filed a Reply.  ECF Nos. 48 & 49.  A hearing on the motion was held on March 23, 2022.  ECF Nos. 61, 65.  At the hearing, testimony was presented from Brentwood Borough Police Officers Wagner and Michael Fisher.

Following the hearing, defense counsel notified the Court of a recent Third Circuit Court Opinion, <u>United States v. Hurtt</u>, 31 F.4th 152 (3d Cir. 2022), relevant to Mr. Eddings Motion.  ECF No. 63.  The Court ordered the parties to file supplemental briefing addressing the applicability of the <u>Hurtt</u> decision to the present motion to suppress.  ECF No. 64.  In response, Mr. Eddings filed his Supplement to Motion to Suppress, ECF No. 68, and the

government filed a Response to the Supplement, ECF No. 69.  After consideration of the

pleadings, exhibits, the testimony offered at the hearing, and the arguments of counsel, and for

the reasons that follow, Defendant's Motion will be denied.

**I.**  **Findings of Fact**

1.      Officer Farrell Wagner has been employed by the Brentwood Borough Police

Department since 2013. Tr. Supp. Hrg, Mar. 23, 2022, at 4 (ECF No. 65).

2.      He attended the Allegheny County Police Academy in 2009, undergoing forty

hours of training per week for six months.  Tr. 5.

3.      He testified that he received a minimum of forty hours training on

Pennsylvania's traffic code, and he also received some training on conducting traffic stops

and searching vehicles and vehicle occupants.  Id.

3.      Officer Wagner also received on-the-job training on conducting traffic stops.

Tr. 5-6.

4.      Officer Wagner has received training in identifying likely criminal vehicles

and likely criminal occupants of vehicles.  He has been trained in identifying deceptive

driving behavior, interviewing and interrogating suspects, and identifying deceptive behavior

by reading body language and how the suspect speaks.  Tr. 6-7.

5.      He also spent time with the Pennsylvania state attorney general's drug task

force investigating violations of drug and firearm laws.  Tr. 7.

6.      He testified that he has conducted thousands of traffic stops with

approximately 25% of said traffic stops involving searches of the vehicle.  Tr. 6.

### *Observation and Stop of the Vehicle*

7.      In the early morning of September 16, 2020, Officer Wagner was alone in a marked police vehicle monitoring traffic along Route 51 when he observed a vehicle traveling North at a much higher rate of speed than the posted speed limit.  Tr. 11-14, 15.

8.      As the vehicle approached Officer Wagner's stationery position, he saw it brake suddenly and then continue to proceed past Officer Wagner.  Tr. 14.

9.      Based on the observation that the vehicle was speeding, Officer Wagner pulled out from his posted position and followed the vehicle.  Id.  He testified that he ran the vehicle's license plate and discovered that the registration plate was temporary.  Id.  He further noted that, contrary to the Pennsylvania vehicle code, the vehicle did not have its registration permit affixed to the lower left-hand side of the rear window.[1]  Id.  Finally, Officer Wagner observed that the vehicle was missing its rear window altogether, which is also a violation of the Pennsylvania vehicle code.[2]  Id.

10.     Officer Wagner activated his emergency lights and conducted a traffic stop of the vehicle.  Tr. 14.  The stop was recorded on both video and audio recording devices.  Sept. 26, 2018 Incident R. 1; Dash Cam Video.

11.     The vehicle came to a stop at approximately 2:27:45 a.m.  Officer Wagner approached the vehicle's occupants at about 2:28:16 a.m.  Dash Cam Video.

---

[1] "Except as otherwise provided, a registration permit shall be affixed to the extreme lower left-hand (driver side) inside corner of the rear window of a vehicle with the printed information visible from the outside."  75 Pa. Cons. Stat. § 1310.1(c).

[2] "It is unlawful . . . to operate on any highway in this Commonwealth any vehicle . . . unless the vehicle is equipped with safety glass or similar material, . . in doors, windows, windshields and wings."  75 Pa. Cons. Stat. § 4526(a).

12.   Officer Wagner testified that during traffic stops for "simple" violations such as were present in this case the driver is the only person responsible.  Tr. 18.  The "passengers really don't have involvement in a normal traffic stop except that they were unfortunate enough to be in that vehicle at that time."  Id.

13.   As Officer Wagner approached the passenger side of the vehicle, he could see the back seat passenger, Mr. Eddings, looking at his cell phone and he could see the front seat passenger, Brandy Muniz, lighting a cigarette.  Id.

14.   Officer Wagner explained that in his experience, passengers who engage in behavior such as "intently" staring at a phone and not acknowledging the oncoming officer or deciding to light a cigarette before the officer arrives at the door, are exhibiting signs of nervousness and uncomfortableness.  Tr. 18-19.

15.   Such behavior signals to Officer Wagner that something more is going on with the passengers.  Tr. 19.

16.   From the time Officer Wagner first spotted the vehicle speeding, to the time he stopped the vehicle, he did not see either front seat occupant gesture towards the back seat or try to put any item from the front seat into the back seat.  Tr. 20.

### *Vehicle Information and Identification of Occupants*

17.   Officer Wagner testified that in every traffic stop he needs "to identify the driver and get the vehicle information, which normally includes registration and insurance information."  Tr. 19.

18.   Because the vehicle's license plate was a temporary tag, Officer Wagner also expected to be given a title sheet (also known as a "pink sheet") that should identify where

4

and when the vehicle was purchased, insurance information, and the tag assigned to the vehicle.  Tr. 20.

19.     Officer Wagner first asked the driver, Natalie Marshall, for her identification and then he asked the two passengers for their identification.  Tr. 21.  Specifically, Officer Wagner asked the passengers to provide their name and date of birth.  Id.

20.     Officer Wagner testified that depending on the circumstances he encounters during a traffic stop, he conducts warrant checks on passengers in approximately 50% of traffic stops.  Tr. 22.

21.     Officer Wagner testified that the reasons why he asked for the passengers' information in this case were because: (i) the passengers were acting suspiciously and appeared uncomfortable by Officer Wanger's presence, (ii) the vehicle may have been stolen as its registration had not been verified, (iii) the rear window was missing, appearing to have been "punched out" for an unknown reason, and (iv) Officer Wagner was the only officer on the scene.  Tr. 21.

22.     Officer Wagner conducted a warrant check on Mr. Eddings first.  Tr. 22.  Next, he ran a warrant check on Ms. Muniz.  Id.  Finally, Officer Wagner ran Ms. Marshall's identification information and also verified the temporary tag and title sheet information of the vehicle.  Tr. 23.

23.     The warrant checks indicated an active arrest warrant for the front seat passenger, Ms. Muniz.  Id.

***Arrest of Ms. Muniz***

24.     Around the time that Officer Wagner discovered that Ms. Muniz had an outstanding arrest warrant, Officer Persichetti from the neighboring Whitehall Police department, arrived on the scene.  Tr. 24.

25.     Officer Persichetti stayed on the scene because Officer Wagner informed him that "there's a wanted person in the vehicle," referring to Ms. Muniz.  Tr. 24, 25.

26.     With Officer Persichetti stationed at the rear passenger side of the vehicle, Officer Wagner approached the front passenger seat and asked Ms. Muniz to step out of the vehicle.  Tr. 25; Dash Cam Video.  Officer Wagner told her she was under arrest and handcuffed her.  Tr. 25; Dash Cam Video.

27.     Officer Wagner made sure Ms. Muniz did not have weapons on her and placed her in the backseat of his patrol car.  Tr. 30.

28.     While Ms. Muniz was being handcuffed, Officer Michael Fisher of the Brentwood Borough Police Department arrived on the scene.  Tr. 112, 115; Dash Cam Video.

***Drug Paraphernalia Found in the Vehicle***

29.  As Ms. Muniz exited the vehicle, Officer Wagner observed needles and empty heroin stamp bags on the front seat.  Tr. 25-26; Ex. 2.

30.     Officer Fisher also observed drug paraphernalia in the front seat area.  Tr. 117.

31.     Officer Wagner testified that he needed to "further investigate why there is illegal drug paraphernalia in [the] vehicle."  Tr. 30.

### *Removal of Ms. Marshall and Mr. Eddings from the Car*

32.     Next, Officer Wagner returned to the driver side door and asked Ms. Marshall to exit the vehicle.  Tr. 31.

33.     Officer Wagner asked her if she had any weapons, to which she replied, "no." Id.  Officer Wagner's visual check confirmed that Ms. Marshall did not appear to have any items resembling a weapon on her.  Id.

34.     After Ms. Marshall exited the vehicle and moved to the sidewalk, Officer Fisher asked Mr. Eddings to exit the vehicle, which he did.  Tr. 118; Dash Cam Video.

35.     Officer Fisher asked Mr. Eddings if he had anything on him that Officer Fischer should know about.  Tr. 119.  Mr. Eddings stated that he had a "weed scale" on him. Id.  Officer Wagner testified that he heard Officer Fisher's question and Mr. Eddings answer. Tr. 34, 87-88.

36.     Officer Fisher then had Mr. Eddings face the trunk with his hands lifted, while Officer Fisher reached into Mr. Eddings' pockets and pulled out a scale, headphones, a cell phone, and a quantity of money.  Tr. 32-33, 119.  Officer Fisher also pulled up Mr. Eddings' pant legs and viewed his ankles to see if any weapons were hidden there.  Tr. 91.  Mr. Eddings did not have any weapons on him.

37.     Officer Fisher returned the items to Mr. Eddings.  Tr. 119.  Before returning the cell phone, Officer Fisher testified that he tried to turn the cell phone off but was unable to do so.  Tr. 139.

38.     Officer Fisher then directed Mr. Eddings to sit on the curb of the sidewalk.  Tr. 120.

### Search of the Vehicle

39.     Officer Wagner and Officer Persichetti then proceeded to search the vehicle. Tr. 38-39.

40.     Officer Wagner "located nothing in the front driver area." Tr. 38.

41.     In the rear passenger area Officer Wagner located a white bandana with an object inside of it, which proved to be a .380 Bersa handgun. Tr. 39.

42.     After finding the handgun, Officer Wagner placed Mr. Eddings into handcuffs for officer safety. Tr. 39-40.

43.     Officer Wagner relayed the firearm's serial number to dispatch to determine ownership of the gun and whether it was stolen. Tr. 43. None of the occupants of the vehicle were reported to be the registered owner of the firearm and all three denied that the firearm was theirs. Id.

44.     Prior to being handcuffed, Mr. Eddings had been scrolling through his cell phone. Tr. 135. He placed the cell phone on the sidewalk just before Officer Wagner handcuffed him. Tr. 136. Officer Fisher then picked up Mr. Eddings' cell phone to turn it off. Tr. 121, 126, 138. Officer Fisher tried to turn off the phone for about seven to eight seconds. Dash Cam Video.

### Concluding the Traffic Stop

45.     As the traffic stop concluded, Ms. Marshall was given a ticket and she was permitted to go. Dash Cam Video.

46.     Officer Wagner transported Ms. Muniz to the Brentwood Borough police station. Dash Cam Video; Tr. 95.

47.     Officer Fisher transported Mr. Eddings to the Brentwood Borough police station.  Tr. 122-123.

### *Miranda* Rights and Search of Cell Phone

48.     At the police station, Officer Wagner read Mr. Eddings his Miranda rights.  Tr. 46.  Officer Wagner also read to Mr. Eddings the Brentwood Borough Police Department's Miranda waiver form.  Tr. 48.  Mr. Eddings signed the waiver of Miranda rights form, indicating that he waived said rights.  Tr. 46.

49.     Officer Wagner told Mr. Eddings that he was going to apply for a search warrant to search his cell phone and asked Mr. Eddings if he would consent to a search of his cell phone  Tr. 48, 100.

50.     Mr. Eddings verbally consented to a search of his cell phone and signed a Brentwood Borough Police Department Voluntary Consent to Search form.  Tr. 48-50.  Mr. Eddings also provided Officer Wagner with the passcode to open his cell phone.  Tr. 48.

51.     While searching Mr. Eddings' cell phone, Officer Wagner discovered a photograph of a male holding two firearms.  Tr. 52.  He also viewed a message exchange between the male in the photograph and Mr. Eddings that, in relevant part, concerned the sale of a .380 caliber firearm to Mr. Eddings.  Tr. 52-54.

52.     Officer Wagner then chose to apply for a search warrant for the cell phone.  Tr. 54-56.

53.     The Brentwood Borough Police Department filed state charges against Mr. Eddings of possession of drug paraphernalia, a person not to possess a firearm, and carrying a firearm without a license.  Tr. 56.

54.    The state charges were dismissed as a result of the federal government adopting the present unlawful possession of a firearm charge.

**II.  <u>Conclusions of Law</u>**

Mr. Eddings argues that the traffic stop was unlawful at its inception.  Thereafter, he argues that the police officers improperly extended the traffic stop on several occasions beginning with the request for passenger identification.  Mr. Eddings argues that the police officers unlawfully extended the stop by investigating matters unrelated to the reason for the traffic stop.  Mr. Eddings also argues that the officers lacked reasonable suspicion of criminal activity to justify deviations from the traffic stop mission.  Finally, Mr. Eddings urges the Court to find that the evidence and statements in this case were unlawfully obtained under the Pennsylvania Constitution.

*Traffic Stop*

1.    The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

2.    "The United States Supreme Court has held that stopping a car and detaining its occupants is a seizure under the Fourth Amendment."  <u>United States v. Johnson</u>, 63 F.3d 242, 245 (3d Cir. 1995) (citing <u>United States v. Hensley</u>, 469 U.S. 221, 226 (1985).

3.    In <u>Terry v. Ohio</u>, the Supreme Court held that a brief investigatory warrantless search, based on less than probable cause, is permissible under the Fourth Amendment where

a police officer has a reasonable, articulable suspicion that criminal activity is afoot.  Terry, 392 U.S. 1, 30 (1968), see also United States v. Yamba, 506 F.3d 251, 255 (3d Cir. 2007).

    4.        Accordingly, "a stop to check a driver's license and registration is constitutional when it is based on an 'articulable and reasonable suspicion that ... either the vehicle or an occupant' has violated the law."  Johnson, 63 F.3d at 245 (quoting Delaware v. Prouse, 440 U.S. 648, 663 (1979)).

    5.        Officer Wagner initiated a traffic stop of Ms. Marshall's vehicle after he observed the vehicle speeding.

    6.        Officer Wagner testified that before he conducted the traffic stop, he had learned that the vehicle had a temporary license plate.  He further observed that the vehicle was not displaying a temporary registration permit on the rear window as required, and he observed that the rear window was missing.

    7.        The defense argues that Officer Wagner conducted the license plate check *after* he stopped the vehicle.  With respect to probable cause to conduct the stop it is immaterial as to when the license plate check occurred as probable cause is established by Officer Wagner's observation that the vehicle was traveling in excess of the speed limit.

    8.        The Court finds that Officer Wagner "possessed specific, articulable facts that [Ms. Marshall] was violating a traffic law at the time of the stop," and therefore the stop of the vehicle was justified.  Delfin-Colina, 464 F.3d at 398.

### *Alleged Inconsistencies in Officer Wagner's and Officer Fisher's Testimony*

    9.        The defense argues that inconsistencies in both Officer Wagner's and Officer Fisher's testimony call into question the officers' testimony in general.  Tr. 148; 148-157.

10.     The Court finds that Officer Wagner's and Officer Fisher's testimony was credible overall, and that any minor inconsistencies in testimony do not affect the legal issues decided herein.  The Court reviews the alleged inconsistences with respect to the speed limit on the roadway, the drug paraphernalia in the vehicle, Mr. Eddings telling the officers he had a weed scale on him, and when Officer Wagner had the vehicle's license plate checked.

### Officer Wagner's Testimony as to the Speed Limit

11.     The defense argues that Officer Wagner's testimony as to the speed limit in the area is inconsistent with the actual speed limit, and therefore calls into question his testimony in general.  Officer Wagner stated in his report (and in his later affidavit in support of a search warrant) that the speed limit in the area is 40 miles per hour.  The Dash Cam Video at the spot where the vehicle was stopped, however, shows a 35 mile per hour speed limit sign.  Tr. 67, 149.  Officer Wagner's testimony that the vehicle was speeding was credible.  It is immaterial that Officer Wagner reported that the speed limit on the road was 40 mph, rather than 35 mph. He testified that the vehicle was violating the law by traveling in excess of the speed limit. Assuming that Officer Wagner was measuring the vehicle's speed as traveling "above 40-mph," such speed is also in excess of a 35-mph speed limit.  The Court finds that to the extent there is an inconsistency it does not call into question Officer Wagner's overall testimony.

### Drug Paraphernalia Observed in the Vehicle by the Officers

12.     The defense also asserts that Officer Wagner's testimony, that he saw drug paraphernalia, is not credible because there is an inconsistency between what he reported he saw and what was recovered.  Tr. 153-54.  The Court disagrees and finds that both officers'

12

testimony, concerning the items of drug paraphernalia that they saw in plain view in the front seat after Ms. Muniz was removed from the vehicle was credible.

### *Testimony regarding Mr. Eddings Response to Officer Fisher's Question*

13.     Officer Fisher asked Mr. Eddings, "do you have anything on you that I should be concerned about?"  Both officers testified that when Mr. Eddings was removed from the car, he responded to Officer Fisher's question by stating that he had a weed scale on him. The defense argues that it is not credible that Mr. Eddings stated to Officer Fisher that he had a weed scale on him prior to Officer Fisher patting down his pockets and removing items.  Tr. 154.  The defense argues that the video footage shows that Mr. Eddings could only have provided the statement when Officer Fisher was behind him patting him down and Officer Wagner was to the side with a flashlight in Mr. Eddings face.  Tr. 154-55.

14.     The defense's argument depends upon assuming that Officer Fisher did not ask Mr. Eddings if he "had anything on him he should be concerned about," until after Mr. Eddings had completely exited the car and was positioned at the rear of the vehicle. Beginning at 2:37:00 of the video footage, however, the activity suggests that Officer Fisher may have asked Mr. Eddings the question just prior to opening the back seat door or as Mr. Eddings was exiting the vehicle.  Dash Cam Video.  Officer Fisher's testimony is that he asked his question "[w]hen [Mr. Eddings] got out."  Tr. 119.  Furthermore, Mr. Eddings face is not visible as he had his hood up, making it difficult for a viewer to know when he was speaking.  In addition, this sequence is consistent with Officer Wagner's testimony that he was at the driver's side of the car when he heard the question and answer.  Tr. 34, 87-88;

Dash Cam Video at 2:37:06.  On the basis of the above, and the officers' testimony, the Court concludes that the officers' testimony is credible.

### *Testimony Regarding When the Vehicle's License Plate was Checked?*

15.     The defense argues that the evidence shows that Officer Wagner did not call to check on the license plate until after he had already stopped the car.  This chronology is in conflict with Officer Wager's testimony that he had ran the license plate while following the car.

16.     Acknowledging the defense's argument, the Court finds that the evidence relied upon by the defense is, at best, inconclusive.

17.     First, Officer Wagner's Case Report is consistent with his testimony at the suppression hearing.  Def. Ex. A (ECF No. 48-2).  In the Case Report, he stated that he observed a vehicle traveling over 60 mph and that when he caught up to the vehicle, he ran the plate and discovered it was a temporary plate.  Def. Ex. A. at 12.  He stated that the vehicle was not displaying a temporary permit in the rear window, and he stated that there was no rear window.  Def. Ex. A. at 12.

18.     On cross-examination, the defense elicited the potential inconsistency as to whether the vehicle's plate was checked before or after Officer Wagner stopped the car.  Tr. 69-72.  In apparent contradiction to Officer Wagner's testimony and his Case Report, the "Detailed History for Police Event," also known as a "CAD Report," for this traffic stop appears to show that the vehicle's license plate was checked at 2:28:32, after the vehicle had already been stopped.  Def. Ex. B.  It is noted that the CAD Report was created at 2:28:32. Def. Ex. B.

14

19.     Video of the incident shows that the vehicle comes to a stop at approximately 2:27:45.  Dash Cam Video.  At 2:27:58 of the traffic stop, Officer Wagner can be heard informing the dispatcher of his location (intersection of Routes 51/88) and informing the dispatcher of the license plate of the vehicle.  Dash Cam Video.  Thirteen seconds later, at 2:28:11 a.m., the dispatcher indicates that he received the information.  Dash Cam Video.  Five seconds after the dispatcher confirmed he received the information at 2:28:16, Officer Wagner is seen outside his patrol car approaching the vehicle.  Dash Cam Video.

20.     There is no indication that the dispatcher reported back any information to Officer Wagner in the five seconds between acknowledging receipt of the license plate and when Officer Wagner is clearly out of his patrol car.[3]  Thus, the Dash Cam Video and CAD Report do not provide conclusive evidence that Officer Wagner ran the license plate prior to the vehicle being stopped.

21.     On cross-examination, Officer Wagner continued to maintain that he checked the license plate prior to the stop.

> Q.     So this is before you put your car lights on, your police lights on, that you knew it was a temporary tag?
> A.     I believe so, yes.
> Q.     It's definitely before you pulled the car over?
>  . . .
> A.     That's my recollection, yes.
> . . .
> Q.     And you didn't notice a missing windshield until after you ran the license plate; is that correct?
> A.     I believe so, yes.

---

[3]  Compare with Officer Wagner's request to the dispatcher to check the firearm found in the backseat later during the traffic stop.  At approximately 2:42:15 of the traffic stop, Officer Wagner is heard asking dispatch to check on the firearm by running the serial number, and dispatch is heard reporting back the results to Officer Wagner.  Dash Cam Video, 2:42:15-2:44:56.

Tr. 70.

22.     The Court finds that Officer Wagner's testimony, that he called to check on the

vehicle's license plate and learned that it was a temporary registration before he initiated the

traffic stop, is credible.

*Length of the Traffic Stop*

23.     Even if the traffic stop itself was lawful, Mr. Eddings argues that all evidence

and statements obtained from him should be suppressed because the Officers unlawfully

prolonged the stop in an effort to search Mr. Eddings and the vehicle without reasonable

suspicion of criminal activity.

24.     A "'police stop exceeding the time needed to handle the matter for which the

stop was made violates the Constitution's shield against unreasonable seizures.'" United

States v. Hurtt, 31 F.4th 152, 159 (3d Cir. 2022) (quoting Rodriguez v. United States, 575

U.S. 348, 350 (2015)).

25.     "Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop

context is determined by the seizure's 'mission'—to address the traffic violation that

warranted the stop [] and attend to related safety concerns []." Rodriguez, 575 U.S. at 354

(internal citations omitted).

26.     Tasks ordinarily tied to the mission of a traffic stop include: "checking the

driver's license, determining whether there are outstanding warrants against the driver, and

inspecting the automobile's registration and proof of insurance." Rodriguez, 575 U.S. at 355.

27.     In addition, "some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop, as do delays caused by safety concerns related to the stop. United States v. Garner, 961 F.3d 264, 271 (3d Cir. 2020).

28.     "If an extension of a stop prolongs it 'beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation,' the resulting delay must be supported by reasonable suspicion." Hurtt, 31 F.4th at 159 (quoting Rodriguez, 575 U.S. at 350-51)).

29.     "'An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes.'" Hurtt, 31 F.4th at 159 (quoting United States v. Green, 897 F.3d 173, 179 (3d Cir. 2018)).

30.     "When reviewing an allegation that a traffic stop started out properly but later was improperly extended, [Courts] 'look[ ] to the facts and circumstances confronting [the officer] to determine whether his or her actions during the stop were reasonable.'" Hurtt, 31 F.4th at 159 (quoting United States v. Clark, 902 F.3d 404, 409 (3d Cir. 2018)).

31.     A Court must determine when a traffic stop was "'measurably extended'" and "'assess whether the facts available'" to the officer at the time the stop was extended "'were sufficient to establish reasonable suspicion.'" Hurtt, 31 F.4th at 159 (quoting Green, 897 F.3d at 179)). "'[N]othing later in the stop can inform [the] reasonable suspicion analysis.'" Id. (quoting Green, 897 F.3d at 182)).

### *Mission of the Traffic Stop*

32.     Officer Wagner's reason for initiating the traffic stop was because he observed the vehicle speeding.

33.     Officer Wagner further learned that the vehicle had a temporary registration plate and the vehicle's registration permit was not displayed on the vehicle's rear window as required by law.  This was because, as Officer Wagner observed, the rear window of the vehicle was missing, which was also a violation of the law.

34.     Officer Wagner approached the passenger side of the vehicle with the "mission" to issue a warning or a ticket, to investigate who the vehicle was registered to (and whether it was stolen), and to investigate the reason for the missing rear window.  The Court finds that all of these tasks were "on mission" as directly related to the reason for the traffic stop.  See Hurtt, 31 F.4th at 160.

### Passenger Check

35.     Mr. Eddings argues that the Officer Wagner unlawfully deviated from the mission of the traffic stop when he requested identification from the passengers and conducted a warrant check on the passengers.

36.     As he approached the passenger side of the vehicle, Officer Wagner observed the back seat passenger intently staring at his cell phone.  He observed the front seat passenger lighting a cigarette.  Officer Wagner testified that such behaviors by passengers during a traffic stop appeared unusual and suspicious.

37.     Officer Wagner asked the driver, Ms. Marshall, for her license and registration, which she gave to him.

38.     Officer Wagner then asked each of the passengers for their name and date of birth.  Both passengers gave him their identification information.  Officer Wagner went back to his patrol car and conducted a warrant check on each of the vehicle's occupants.

39.     Mr. Eddings argues that Officer Wagner veered from the mission of the traffic stop when he asked the passengers for identification and conducted a warrant check.  He argues that Officer Wagner's passenger warrant check is an unlawful deviation from the traffic stop's mission under Rodriguez and is unsupported by reasonable suspicion.

40.     The Third Circuit "call[s] the time at which a stop is measurably extended—'when tasks tied to the traffic stop are completed or reasonably should have been completed'—the " 'Rodriguez moment.'"  United States v. Burrus, 845 F. App'x 187, 189 (3d Cir. 2021) (quoting United States v. Garner, 961 F.3d 264, 270 (3d Cir. 2020); see also Hurtt, 31 F.4th at 159.

41.     Recognizing the difficulty of pinpointing the Rodriguez moment, the Third Circuit "suggested that, in appropriate cases, district courts might sidestep the difficult task of pinpointing the actual Rodriguez moment by simply assuming the defendant's proposed earliest potential Rodriguez moment."  United States v. Wilburn, No. 2:18-CR-115, 2021 WL 1310423, at *25 (W.D. Pa. Apr. 8, 2021) (citing United States v. Green, 897 F.3d 173, 179 (3d Cir. 2018).

42.     Here, the Court assumes without deciding that the earliest moment when the traffic stop was measurably extended, the Rodriguez moment, is the Defendant's proposed earliest potential Rodriguez moment, which is when Office Wagner requested the passengers' identification and conducted warrant checks.  Green, 897 F.3d at 179.

43.     The government argues that the traffic stop was not unlawfully extended at this point because law enforcement is permitted to request identification from passengers as part

of a lawful traffic stop to ensure the officers' safety.  Gov. Opp. Br. 8 (ECF No. 48); Gov. Resp. to Supp. 2-3 (ECF No. 69).

44.     The defense argues, however, that Third Circuit case law does not clearly permit law enforcement to request passenger identification, or conduct warrant checks on passengers, as an on-task part of the mission of a traffic stop, absent reasonable suspicion of criminal activity.   Tr. 151-52; Def. Mot. Suppress 8-9.

45.     The Court's research was unable to uncover a Supreme Court or Third Circuit opinion that explicitly addresses the legality of law enforcement requesting passenger identification as part of a traffic stop.

46.     A review of district court and circuit court decisions from around the country, reveal that the majority of decisions concluding that passenger checks are permissible do so on the basis that such action ensures officer safety and therefore is within the mission of the traffic stop.[4]  There are significantly less cases that conclude that asking a passenger for

---

[4]  United States v. Baldonado-Garcia, Criminal No. 11-215, 2012 WL 135698, at *3 (W.D. Pa. Jan. 17, 2012) (police officer may request a passenger's identification during a traffic stop because such a request is "reasonably based on ensuring officer safety at the scene"); United States v. Reynolds, 729 F. App'x 639, 643 (10th Cir. 2018) (police officer may protect his safety during a traffic stop by asking for identification from passengers); United States v. Clark, 879 F.3d 1, 5 (1st Cir. 2018) ("[D]ue to the 'inherent dangers of a traffic stop,' the police may request identification from passengers in the vehicle, so long as those requests 'do not measurably extend the duration of the stop.' ") (quoting United States v. Chaney, 584 F.3d 20, 26 (1st Cir. 2009)); United States v. Fernandez, 600 F.3d 56, 59 (1st Cir. 2010) ("Like the reasonable suspicion that criminal activity is afoot in the Terry context, the detection of a traffic violation permits officers to effect a limited seizure of the driver and any passengers consistently with the Fourth Amendment") (citations omitted). United States v. Soriano-Jarquin, 492 F.3d 495, 500 (4th Cir. 2007) ( police officer take minimally intrusive step of requesting passenger identification as the "identity of the persons in whose company the officer suddenly finds himself may be pertinent to the officer's well-being"); United States v. Rice, 483 F.3d 1079, 1084 (10th Cir. 2007) (police officer may request a passenger's identification because "passengers present a risk to officer safety equal to the risk presented by the driver"); United States v. Hicks, 18-CR-6041CJS, 2018 WL 6595934, at *7 (W.D.N.Y. Dec. 14, 2018) (report and recommendation) ("[A]lthough the Supreme Court has not explicitly held that inquiry into a passenger's identity is permissible, numerous lower courts have held that questions relating to the identity of a passenger are routine and ordinary inquiries to a traffic stop and, in any event, are permissible considering the inherent dangerousness of traffic stops." (citations omitted)); and United States v.

identification (and/or conducting a warrant check) is permissible during a traffic stop as a matter of course, separate from officer safety.[5]  Finally, some courts conclude that a police officer may not ask for a passenger's identification and run a warrant check during a valid traffic stop.[6]

47.     Courts have reasoned that, since the Supreme Court permits officers to order passengers out of the car pending completion of a traffic stop,[7] it follows that an officer is permitted to request a passenger's identification.  United States v. Baldonado-Garcia, Criminal No. 11-215, 2012 WL 135698, at *3 (W.D. Pa. Jan. 17, 2012) (quoting United States v. Soriano–Jarquin, 492 F.3d 495, 500 (4th Cir.2007)).

48.     In United States v. Burrus, the District Court denied a motion to suppress where the defendant argued that law enforcement unlawfully conducted a passenger warrant check.  United States v. Burrus, Cr. No. 18-270, slip op. (W.D. Pa. Aug. 20, 2019).  The District Court's decision that the warrant check was permissible was based on alternative

---

Espinosa, Case No. 1:17-cr-55-CW, 2018 WL 1972466, at *4 (D. Utah Apr. 26, 2018) ("as a part of a lawful traffic stop, an officer may request a passenger's identification information" to ensure his safety).

[5]  United States v. Pack, 612 F.3d 341, 351 (5th Cir. 2010) (police officer may ask passengers to identify themselves and officer may run license check on passengers); United States v. Smith, 601 F.3d 530, 542 (6th Cir. 2010) (police officer checking whether the passenger had valid identification found not an unnecessary extension of a traffic stop); United States v. Rodriguez-Hernandez, 353 F.3d 632, 635 (11th Cir. 2003) (police officer could ask driver and passengers to produce identification where initial traffic stop was valid); and United States v. Wilburn, No. 2:18-CR-115, 2021 WL 1310423, at *26, *28 (W.D. Pa. Apr. 8, 2021) (assuming that Rodriguez permits an officer to request passenger identification and search for active warrants).

[6]  United States v. Landeros, 913 F.3d 862, 868 (9th Cir. 2019) ("A demand for a passenger's identification is not part of the mission of a traffic stop.... The identity of a passenger ... will ordinarily have no relation to a driver's safe operation of a vehicle"); United States v. Henderson, 463 F.3d 27, 46 (1st Cir. 2006) (police officer's demand for a passenger's identification and the officer's subsequent investigation of the passenger improperly "expanded the scope of the stop, changed the target of the stop, and prolonged the stop").

[7]  See Maryland v. Wilson, 519 U.S. 408, 415 (1997) (holding "that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop").

grounds.  First, the District Court found that the warrant check was permissible, because it is a "negligibly burdensome precaution" to ensure officer safety.  Id. at 12-13.  The District Court also found the warrant check permissible, because the police officer had reasonable suspicion that criminal activity was afoot.  Id. at 13-14.  The Third Circuit affirmed the District Court's decision on the basis that the police officer had reasonable suspicion to conduct the warrant check on the passenger, thereby justifying the deviation from the mission.  845 F. App'x at 190.

49.     Here, when Officer Wagner approached the passenger side of the vehicle the circumstances known to him were as follows.  The vehicle had a temporary tag, and therefore he was unable to confirm that the license plate number belonged to this vehicle or whether the vehicle was stolen.  The rear window was missing, which could have been for innocent reasons, but the missing window also could have occurred in connection with dangerous and/or criminal conduct.  Such condition gave rise to legitimate cause for further inquiry.  Ms. Muniz and Mr. Eddings were separately engaged in atypical and suspicious behavior for passengers who were aware that a police officer was approaching the vehicle to conduct a traffic stop and talk to the occupants.  Officer Wagner viewed both passengers' behavior as "suspicious" and "strange for how passengers act"  Tr. 19.   He described it as "nervous" behavior that is "often indicative that there is more going on than just the traffic stop."  Tr. 19. Finally, Officer Wagner was "the only officer on the scene."  Tr. 20.

50.     Although, lighting a cigarette and looking at a cell phone, in isolation, are innocent conduct, Officer Wagner credibly explained that, from his experience, he viewed such passenger behavior during a traffic stop as signs of nervousness and that the behavior

appeared suspicious to him.  The circumstances facing law enforcement during a traffic stop are not viewed in isolation but must be considered in light of the totality of the circumstances. As detailed above, Officer Wagner's decisions were based on more than just the passengers' behavior.

51.     The request for passenger identification arose after Officer Wagner observed several signs that heightened concern and need for ensuring his safety and justified his request for passenger identification.  Because Officer Wagner's actions were motivated by safety concerns, his request for passenger identification was within the mission of the traffic stop. Rodriguez, 555 U.S. at 354.  As such, Officer Wagner's actions were lawful, and did not unlawfully extend the traffic stop.  Hensley, 469 U.S. at 235 (law enforcement "are authorized to take such steps as [are] reasonably necessary to protect their personal safety").  The Court concludes that Officer Wagner was justified in requesting the passenger's identification and conducting warrant checks because the circumstances of the traffic stop known to Officer Wagner as he approached the passenger side of the vehicle heightened the need to ensure his safety.

### *Removal of Ms. Nunez*

52.     The traffic stop was next extended when Officer Wagner, acting on the report that Ms. Nunez had an outstanding arrest warrant, removed Ms. Nunez from the vehicle and arrested her.  Although this action was a deviation from the traffic stop mission, it was factually based on probable cause represented by the active arrest warrant for Ms. Nunez and thus it was justified.

### *Drug Paraphernalia*

53.     As Ms. Nunez exited the vehicle, Officer Wagner saw, in plain view, needles

and stamp bags in the front seat area.  Officer Fisher also observed the needles and stamp

bags.  The officers decided to search the vehicle because of the presence of needles and stamp

bags indicating illegal intravenous drug use.

54.     On the basis of the totality of presentencing circumstances, plus the officers'

observation of drug paraphernalia in the vehicle, they possessed "a reasonable and articulable

suspicion that criminal activity [was] afoot" sufficient to justify a search of the vehicle.

United States v. Kennedy, No. 13-240, 2014 WL 6090409, *8 (W.D. Pa. Nov. 13, 2014).  In

fact, the presence of the needles and stamp bags, which indicated illegal drug use, not only

establishes reasonable suspicion, but also establishes probable cause.  See United States v.

Ramos, 443 F.3d 304, 308 (3d Cir. 2006) (smell of marijuana alone sufficient to establish

reasonable suspicion and probable cause).  The presence of the needles and stamp bags meant

that it was possible that actual drugs or other drug paraphernalia may be found in the vehicle.

Therefore, on the basis of the presence of drug paraphernalia in the front seat area, the officers

possessed sufficient probable cause to search the vehicle.

### *Removal of Occupants from the Vehicle*

55.     Because the officers had probable cause to believe that criminal activity was

afoot and that evidence of such activity may be in the vehicle, for both officer and occupant

safety, the officers lawfully removed Ms. Marshall and Mr. Eddings from the vehicle before it

was searched.  In addition, Officer Wagner testified that "[t]hose who deal in drugs usually

have weapons on them."  Tr. 118.  Therefore, he did not want to search the vehicle while any

of the occupants were potentially armed.  Tr. 31.  Therefore the traffic stop was measurably and properly extended while the officers removed Ms. Marshall and Mr. Eddings from the vehicle and checked them for weapons, and it was measurably and properly extended again while the officers searched the vehicle.

56.    Ms. Marshall was removed from the vehicle before Mr. Eddings.  Officer Wagner asked her if she had any weapons on her, to which she responded, "no."  Officer Wagner conducted a visual weapons check of Ms. Marshall.  Based upon her style of clothing, Officer Wagner felt comfortable that Ms. Marshall did not have a weapon.  He further explained that he did not conduct a pat-down search of Ms. Marshall because department policy is that male officers are "generally not supposed to search women" themselves.[8]  Tr. 32.

57.    Next, Mr. Eddings was asked to exit the vehicle by Officer Fisher.  Tr. 118. Officer Wagner testified that he was able to observe that Mr. Eddings had items in his pockets, which Officer Wagner described as "bulky objects."  Tr.  33.

58.    Officer Fisher asked Mr. Eddings "if there's anything he had on him that [he] should know about, and [Mr. Eddings] said, 'I have a weed scale.'"  Tr. 119 (see also Tr. 34 (Officer Wagner testified he heard Officer Fisher's question and Mr. Eddings answer.))

59.    Mr. Eddings' jacket and pants pockets were searched because the officers did not know whether he had a weapon.  Tr. 34, 118.  Officer Wagner and Officer Fisher knew

---

[8] Officer Wagner further explained why a pat-down search was not necessary. "I did not see any bulges, anything indicative that she was carrying a weapon. Most common places people carry weapons are on their ankles or on their waistline, and both of those were easily visible to me. She even spun around at one point. She was turning and was patting her waist. I saw no bulges or nothing that would make me believe that she was armed at that time."  Tr. 32.

that the presence of drug paraphernalia is associated with weapons and Officer Wagner testified that he wanted to make sure Mr. Eddings did not have a weapon while their attention was focused on searching the vehicle.  Tr. 34, 118.

60.     Consistent with what Mr. Eddings told Officer Fisher, a marijuana scale was found on him.  A marijuana scale may be considered unlawful drug paraphernalia under Pennsylvania law.  Tr. 35.  If the scale is used for personal use, it is a misdemeanor, if it is used in the process of selling drugs it is a felony.  Tr. 35-36.

61.     As already stated, the officers possessed probable cause to search the vehicle. Based on the facts and circumstances known to the officers at the time they decided to search the vehicle, the Court concludes that the officers were justified in removing Ms. Marshall and Mr. Eddings from the vehicle in order to conduct the search.  Similarly, to ensure the safety of all present, it was lawful for the officers to determine whether any of the passengers had weapons on them before they searched the vehicle.  With respect to Mr. Eddings, he was wearing a loose jacket and the officers observed that the pockets of the jacket and pants contained "bulky" objects.  Therefore, based on the totality of circumstances facing the officers at the time they removed Mr. Eddings from the vehicle, the Court concludes that it was lawful for the officers to ask Mr. Eddings if he had anything on him the officer should know about, and it was lawful for the officers to conduct a pat-down search to discover what was in his pockets.

### *Mr. Eddings Cell Phone*

62.     After Mr. Eddings was patted down, he was directed to sit on the curb.  While the vehicle was being searched Mr. Eddings was looking at his cell phone.

63.     Once the firearm was discovered in the backseat, Mr. Eddings was placed in handcuffs.  He placed his cell phone down on the sidewalk.  Officer Fisher picked up Mr. Eddings cell phone and he can be seen on the Dash Cam Video looking at the phone.  Officer Fisher testified that he was attempting to turn it off but was unable to.  Such testimony is credible.

64.     At the police station, Officer Wagner told Mr. Eddings he planned to apply for a search warrant for his cell phone, but also asked Mr. Eddings if he would consent to a search.  Mr. Eddings consented, and Officer Wagner discovered potential incriminating evidence on the phone.  Officer Wagner then stopped searching the cell phone and applied for a search warrant.

65.     The Court finds that Officer Wagner's search of the cell phone was lawful and that Mr. Eddings' consent to search was valid and not obtained by coercion.

### *Applicability of <u>United States v. Hurtt</u>, 31 F.4th 152 (3d Cir. 2022)*

66.     Both parties filed supplemental briefing addressing the applicability of the Third Circuit's opinion in <u>United States v. Hurtt</u>, to the present motion to suppress.  31 F.4th 152 (3d Cir. 2022),

67.     In <u>Hurtt</u>, law enforcement had conducted a traffic stop of a truck for a suspected traffic violation.  In addition to the driver, there was a front seat passenger and a back seat passenger, Mr. Hurtt, in the truck.

68.     The driver and front seat passenger rolled down their windows.  As one officer, Cannon, collected the driver's information, both officers smelled alcohol.  The front seat passenger was heavily intoxicated and when one of the officers asked the front seat passenger for identification, Hurtt volunteered his identification as well.

69.     The driver was removed from the car to take a sobriety test administered by the other officer, Gonzales.

70.     With the front door left open, "[u]ninvited and without apparent justification, Cannon then physically [went] into [the truck], partially put[ting his] body into the cabin of the truck through the open door.  He eventually climbed further into the truck, placing both knees on the driver's seat."  Id. at 156 (internal quotations and citations omitted).

71.     While inside the truck, Cannon "looked around and pointed his flashlight back and forth around the vehicle."  Id.  (internal quotations and citations omitted).  He noticed the front seat passenger was trying to divert attention away from Hurtt.  He ordered the passengers to keep their hands visible, but they did not comply, citing the cold weather.  Cannon then left the car and decided he would have to have the passengers removed.

72.     Meanwhile, Gonzalez was administering the field sobriety test to the driver and eventually noticed that Cannon was inside the truck.  "When Gonzalez noticed Cannon and the predicament, he had placed himself in by placing his body inside the truck, Gonzalez paused his sobriety check out of concern for Cannon's safety."  Id. at 157.  "Although he had not yet run the driver's license or vehicle identification, or finished the sobriety test, Gonzalez put the driver in the patrol car and went to help clear the passengers."  Id.

73.      The Third Circuit summarized the events as follows: "While Gonzalez conducted the on-mission field sobriety test, Cannon entered the truck and kneeled on the front seat, putting himself in a very vulnerable position. Consequently, Gonzalez had to interrupt—indeed he stopped—his attempt to determine the sobriety of the driver for the purpose of ensuring Cannon's safety. At that point, neither officer had reasonable suspicion to search Hurtt." Id. at 161–62.

74.      The Third Circuit further explained that the circumstances requiring off-mission tasks were not justifiable.  The Court stated that Cannon's "precarious conduct required Gonzalez to pause the sobriety test so that he could ensure his partner's safety. Because Cannon created a safety concern by going off-mission, the officers cannot rely upon that concern to justify detouring from the original purpose of the traffic stop." Id. at 162. This "type of police-created exigency cannot justify going off-mission. Because this off-mission conduct was without reasonable suspicion and extended the traffic stop, it was unlawful under Rodriguez and the subsequent search violated Hurtt's Fourth Amendment rights." Id. at 163.

75.      Mr. Eddings argues that, like in Hurtt, there was an off-mission unlawful extension of the stop when Officer Wagner chose to collect identification information from the passengers and conduct warrant checks on them.  Mr. Eddings specifically argues that a violation under Hurtt occurred when the officers unlawfully extended the stop by ordering Mr. Eddings out of the car and subsequently searching his pockets.  He argues that law enforcement had no reason to order Mr. Eddings out of the car and therefore, they also had no reason to frisk Mr. Eddings to ensure officer safety.  In other words, Mr. Eddings argues that

the officers' conduct amounts to a police-created exigency not permitted under <u>Rodriguez</u> and <u>Hurtt</u>.

76.     The factual circumstances here are distinguishable from those in <u>Hurtt</u>.   In <u>Hurtt</u>, the conduct of one of the officers created an exigency requiring the other officer to go off-mission and attend to the police-created-exigency.   Here, Officer Wagner lawfully conducted a traffic stop of a speeding vehicle where the vehicle was missing its rear window and had an unaccounted temporary registration.  Upon approaching the vehicle, Officer Wagner observed suspicious and unusual behavior from both of the passengers.  He therefore conducted a passenger warrant check.  Once an arrest warrant was discovered for Ms. Nunez, the officers had to remove her from the vehicle to arrest her.  The drug paraphernalia observed by the officers in plain view as a result of Ms. Nunez's exit from the vehicle indicated that criminal activity was afoot, which necessitated a search of the car, which required the removal of all occupants and a pat down for officer safety.  None of the above conduct amounts to an unlawful police-created exigency.

### *Pennsylvania Constitution*

77.     As regards the defense argument that the evidence and statements obtained during the traffic stop may be subject to suppression under Pennsylvania law, Def. Mot. at 15-20 (citing Pa. Const. Article 1, sections 8 and 9), this Court is bound to follow Third Circuit precedent that does not permit evidence obtained in violation of state law to be excluded in a federal case.  <u>United States v. Rickus</u>, 737 F.2d 360, 363 (3d Cir. 1984).  Accordingly, Mr. Eddings request that we exclude evidence and statements obtained in violation of state law is denied.

## V.  Conclusion

For the reasons stated above, Mr. Eddings' Motion to Suppress Evidence and

Statements (ECF No. 43) is DENIED.


IT IS SO ORDERED.


Dated: February 6, 2023

_____
Marilyn J. Horan
United States District Court Judge

31